**Gregory A. CLAY, Plaintiff,**

v.

**INTERSTATE NATIONAL CORPORATION, Defendant.**

No. 94 C 4361.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 15, 1995.

Vickie L. Pasley, Vickie Pasley & Associates, Anthony L. Schumann, Duckworth & Schumann, P.C., Chicago, IL, for plaintiff.

Steven L. Gillman, Douglas M. Werman, Fox and Grove, Chartered, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Gregory A. Clay ("Clay") sues defendant Interstate National Corporation ("Interstate") for race discrimination and retaliatory discharge under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Clay alleges that Interstate discriminated against him by giving him an unfavorable performance appraisal in September 1989, placing him on probation in February 1990, and terminating his

employment in August 1990 on the basis of race. Clay also claims that Interstate violated Title VII by discharging him in retaliation for filing charges of discrimination with the State of Illinois Department of Human Rights (IDHR). Interstate's motion for summary judgment is presently before the Court. For the reasons set forth below, the motion is granted.

## BACKGROUND

■ The following undisputed facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits.[1]

*Clay's Performance at Interstate*

Clay began his employment with Interstate on August 31, 1987, as a Cash and Investment Supervisor in Interstate's accounting department. Def.'s Facts ¶ 6. In this capacity, Clay's duties included cash management, wire transfers, vouchering transactions and compilation of investment asset data on a monthly basis for submission to upper management. *Id.* ¶ 7. His initial supervisor was Bonnie Young, a black woman. Young left Interstate in March 1988 and was replaced by Linda Trandel, who is white. *Id.* ¶¶ 8–10. Young never gave Clay a performance evaluation; however, Clay's recollection was that Young never informed him of having any concerns regarding deficiencies in Clay's performance. Pl.'s Add'l Facts ¶ 5.

On August 24, 1988, after supervising Clay for approximately five months, Clay was given an annual performance appraisal by Trandel. Trandel gave Clay an overall rating of 3.3 (on a scale ranging from 1 (lowest) to 5 (highest)), which was defined as follows: "Results achieved consistently meet requirements and objectives in most areas." Def.'s Facts ¶ 11; Def.'s Facts, Ex. 2, Performance Evaluation. Trandel also recommended a 6% merit salary increase for Clay. *Id.* Two "development needs" specifically targeted on the evaluation were Clay's need to develop his supervisory skills and his need to improve his working knowledge of the SMS computer system.[2] Def.'s Facts, Ex. 2. In the "employee response section," Clay rated his degree of agreement with the evaluation at 8 on a scale of 1 (completely disagree) to 10 (completely agree). *Id.*

Clay's shortcomings with respect to the SMS system would become a recurring issue during the period between the August 1988 appraisal and Clay's next performance appraisal in September 1989. Trandel attested that in the fall of 1988, she noticed that Clay's work was sometimes late and inaccurate; so, she assigned a subordinate, Rochelle White, to work under him. Trandel Aff. ¶ 5. On February 24, 1989, Trandel met with Clay and reiterated that he needed to learn data input procedures on the SMS system (as she had previously instructed him) and needed to identify and correct SMS sys-

1. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no general issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Interstate's statement shall be cited herein as "Def.'s Facts ¶." Similarly, Local Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Clay's response shall be cited as "Pl.'s Facts ¶." Local Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; pursuant to Local Rule 12(M), the moving party may then submit a response to the non-moving party's additional facts. Clay's statement of additional facts shall be cited as "Pl.'s Add'l Facts ¶." and Interstate's response shall be cited as "Def.'s Resp. Add'l Facts ¶." All properly supported

material facts set forth in either party's statement (i.e., Def.'s Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b). *See also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993), cert. denied, — U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

2. The SMS system is used to create regular reports regarding Interstate's investment portfolio. Def.'s Facts ¶ 11; Trandel Aff. ¶ 6.

tem problems. Def.'s Facts ¶ 14. Trandel also told Clay that he should better supervise his subordinate, Rochelle White, and should delegate work to another subordinate, Lupe Jaramillo, so that he could better manage his time. *Id.* See also Def.'s Ex. 3. On June 26, 1989, Interstate's Vice President and Controller, Mike Sullivan, and Trandel met with Clay and White. Clay's continuing failure to learn SMS input procedure and rectify SMS system problems was again discussed. Def.'s Facts ¶ 15.[3] At this meeting, Trandel directed Clay to arrange training sessions to learn SMS input procedures by no later than July 5, so that he could input when White, who normally did the inputting, was on vacation. *Id.* at ¶ 16. However, Clay failed to meet this deadline. On July 10, 1989, in a meeting with Trandel, Clay explained that he had been unable to learn input on the system because he had other projects from Mike Sullivan and could not concentrate on learning SMS. Pl.'s Facts ¶ 18. When Trandel instructed Clay that he should work overtime in order to complete his work on SMS, Clay stated that he did not feel that he should have to put in extra time. Def.'s Facts ¶ 18.

Clay's performance was deficient in other aspects in addition to his SMS failures. On June 30, 1989, John Fleming, Interstate's Manager of Systems Development, gave Sullivan a memorandum regarding an error in a corporate financial report. Although the error cited was caused by misprogramming, Clay was responsible for the correct numbers and the error recurred for four days without Clay giving notice to the Management Information Services department to correct the error. Def.'s Facts ¶ 17; Trandel Aff. ¶ 12;

Def.'s Ex. 6. On July 20, 1989, Trandel met with Clay to discuss an incident in which Clay disregarded a directive by removing cash from a bank account after he was told to leave it in the account to cover certified checks. Def.'s Facts ¶ 19; Def.'s Ex. 7.[4]

Sometime around September 13, 1989, Clay was given another performance appraisal by Trandel. This time Trandel gave Clay a rating of 2 ("Needs Improvement"), which is defined as "Performance is only marginally acceptable; it frequently falls below normally expected standards of performance. Must show significant improvement." Def.'s Facts ¶ 20; Def.'s Ex. 12. The appraisal outlined several performance deficiencies. For example, although Clay had learned SMS input procedures, he had still failed to document and resolve SMS system problems. Def.'s Ex. 12. Also, Clay had failed to learn about accounts receivable clearing reconciliations in order to review his subordinates' work. *Id.*[5]

The September 1989 appraisal directed Clay to complete the reconciliations by November 1. However, in spite of several reminders of this duty, Clay had still not started work on this assignment in early November. As a result, Trandel was required to work 16 hours on a weekend to complete Clay's work. Def.'s Facts ¶ 24; Trandel Aff. ¶ 27. Subsequent to this event, Trandel again specifically instructed Clay to familiarize himself with the reconciliation process by a memo dated November 16. Def.'s Facts ¶ 25; Def.'s Ex. 15.

Clay continued to disregard Trandel's instructions, however. Trandel met with Clay on December 5 and again on January 26, 1990 to discuss Clay's failure to complete his

3. In his Local Rule 12(N) statement, Clay disputes ¶ 15 of Interstate's Rule 12(M) statement. Clay insists that he had performed evaluations regarding the SMS problems, as well as pointed to some things that were not working properly. Pl.'s Facts at ¶ 15. Trandel admits that Clay had done some work on the system and had indeed pointed out some problems. However, Trandel still instructed Clay that she needed to know the reasons the system was not working properly and how problems could be rectified.

4. Clay disputes part of ¶ 19 of Interstate's Rule 12(M) statement. However, because Clay's objection does not concern this bank account incident, the Court deems it admitted by Clay.

5. Clay disagrees with part of ¶ 20 of Interstate's Rule 12(M) statement. He seems to dispute that the reconciliations were his duty by arguing that Trandel could not remember when she told him of this duty. However, this assertion is not supported by the record. In Trandel's deposition, she *specifically states that she informed Clay* of his duties in this area in January 1989. Trandel Dep. at 74–75. Also, in Clay's subsequent response to the appraisal, he admits that he "previously accepted the responsibility for assuming the review and approval of the accounts receivable reconciliation." Def.'s Facts, Ex. 13.

reconciliation duties. At the January 26 meeting, when Clay stated that he could not complete the work because his other work took the entire day, Trandel suggested again that Clay should work more hours. In response to this suggestion, Clay stated that he "was not going to kill himself to get the work done." Def.'s Facts ¶ 27; Trandel Aff. ¶ 29.

On February 1, 1990, Clay was placed on probation. The stated reasons for the probation were Clay's failure to complete the monthly reconciliations and Clay's failure to document and correct errors regarding SMS input and processing. Def.'s Facts ¶ 28; Def.'s Facts Ex. 18. Trandel's probation notice to Clay set out specific performance goals concerning the monthly reconciliations. The notice further provided: "Improvement and completion of the assignments outlined is mandatory and must be immediate and sustained throughout your tenure with Interstate. Failure to prepare the reconciliations and eliminate errors associated with the manual investment functions will result in your termination. Your progress will be reviewed on March 1, 1990, and a decision regarding your continued employment will be made at that time." Def.'s Facts, Ex. 18. Clay was removed from probation on March 16, 1990 because he finally completed the reconciliation goals, albeit only after Trandel had discovered errors in the work Clay had submitted, reviewed Clay's revisions, and accepted the work late. Def.'s Facts ¶ 30; Trandel Aff. ¶ 31–35.

Clay's work performance did not improve after being removed from probation. In April 1990, he failed to insure that certain bank accounts were properly funded and failed to timely provide his performance goals to superiors. Def.'s Facts ¶ 34. On June 19, he refused to review procedures for preparing an earned investment income report when requested to do so by Bruno Grela, a supervisor in the accounting depart-

ment. Trandel Aff. ¶ 41.[6] On June 21, he submitted transaction vouchers for June 7, 8, 13, 14, and 15 which were not only late, but were done out of order, contrary to Interstate's policy. Id. ¶ 42.

On July 2, 1990, Clay was given another performance appraisal with an overall rating of 2 ("Needs Improvement"). The appraisal discussed the same types of shortcomings addressed in the appraisal of September 1989. Def.'s Facts ¶ 36; Def.'s Facts, Ex. 33. Also, on this date, Clay was again placed on probation. The stated reasons for the probation were Clay's failure to inform management of an extraordinary capital gain in excess of two million dollars, Clay's lack of cooperation with management and co-workers in preparing certain reports (Trandel specifically denounced Clay's refusal to follow the request of Bruno Grela), and Clay's failure to meet monthly deadlines for reporting investment figures. Def.'s Facts ¶ 37; Def.'s Ex. 34. Clay was informed of his probation status in writing and further informed that his progress would be reviewed on August 3, 1990, and a determination concerning his continued employment would be made at that time. Def.'s Facts ¶ 37. Clay contested the contents of the probation notice provided to him by Trandel. His signature on the notice is preceded by his remarks, among other things, that "The accusations contained in this memo are totally untrue. There is no evidence to substantiate the charges mentioned. I can prove conclusively that what is being alleged is not accurate." Def.'s Ex. 34.

On July 30, 1990, Interstate received notice from the Illinois Department of Human Rights that Clay had filed a charge of discrimination. Def.'s Facts ¶ 39. On August 3, 1990, Trandel extended Clay's probation so that Interstate's Assistant Vice President and Assistant General Counsel John Ricca could conduct an internal investigation of the discrimination charge. Def.'s Facts ¶ 40.[7]

---

**6.** In response to Grela's request, Clay stated that he would just throw away all of the papers if Grela left them with him. When Trandel discussed the incident with Clay, he stated that if Grela "couldn't handle his workload, I'm not going to do it for him." Trandel Aff. at ¶ 41.

**7.** Clay does not dispute this statement. We note, however, that in the memorandum from Trandel

to Clay explaining that his probation was being extended, Trandel states that the extension was due to the fact that Clay's status had not yet been completely reviewed. Def.'s Facts, Ex. 37. The memorandum further explains that: "Your status will be reviewed over the next two weeks. If at any time during the next two weeks it is determined that you have not complied with the terms

Clay's performance continued to be deficient after he was placed on probation for the second time. After July 2, 1990, Clay failed to inform Trandel of an extraordinary capital gain, failed to inform Trandel of a two million dollar wire transfer he had initiated, and failed to inform her of another $1,276,049.19 wire transfer. In addition, Clay had not been supervising an intern and had missed deadlines for completing a bank directory and for completing reconciliations. Def.'s Facts ¶ 41; Trandel Aff. ¶ 52. Trandel subsequently recommended termination. The recommendation was approved by John Ricca, Carol Newman (General Counsel and Vice President, Human Resources), Mike Suerth (Controller), and Mike Sullivan (Senior Vice President and Chief Financial Officer). Clay was discharged on August 16, 1990. Def.'s Facts. ¶ 42; Def.'s Facts, Ex. 38. In a Termination of Employment letter, Trandel stated that Clay was being terminated "due to your failure to meet the terms of your probation as outlined in my July 2, 1990 memorandum to you." Def.'s Facts, Ex. 38.

*Clay's Evidence of Racial Discrimination*

Clay contends that while employed at Interstate, he experienced several instances evidencing racial animus and discrimination. One such instance of racially motivated action took place on July 27, 1989, when Laura McDonald, a word processing supervisor, complained to Trandel that Clay had not responded in a timely fashion to a request for blank drafts. Pl.'s Add'l Facts ¶ 22; Clay Dep. at 530–31. Clay states that he received a "reprimand" from Trandel as a result of the complaint by McDonald. Pl.'s Add'l Facts ¶ 22. In his deposition, Clay stated that he believed the "only logical explanation is obviously race." He came to this conclusion because (1) he was not given the chance to state his position on the issue and (2) he was the only non-white employee who was involved and was not treated on an equal basis with other white employees who were involved. Clay Dep. at 530–31. However, there is no evidence in the record concerning which other employees were involved, their race, and what, if any, consequences they suffered.

Other evidence of racial animus offered by Clay relates to an incident that occurred in September 1989. At that time, each Interstate department had a photograph taken depicting a theme relating to the department's area of responsibility. The employees in Clay's department decided to pose as "tough guy mob type bill collectors." As costumes consistent with the theme, the employees decided to wear black fedoras and dark sunglasses. Rochelle White refused to participate because she did not like to be photographed. Clay refused to participate because he found the picture offensive to blacks. Clay Dep. at 532. Clay testified in his deposition that he refused to participate because he believed the idea of donning a derby and frolicking in front of a camera was akin to a "step and fetching racial stereotyped routine."[8] Clay Dep. at 218–223. Clay testified that all employees in the department were requested to wear the costume regardless of their race. *Id.* at 222. In a subsequent conversation with Trandel concerning the incident, Clay claims that Trandel said "something to the effect that you people are causing problems, causing too many problems." Clay Dep. at 217. It was evident to Clay that the expression "you people" referred to black people because of the emphasis on "you people", the inflection in Trandel's voice, and the fact that Trandel was referring to the photograph incident involving Clay and White. Clay Dep. at 531–32.

A third incident of racial animus cited by Clay was a comment made by Brian Harrison, a co-employee at Interstate. On November 9, 1989, Clay complained in writing to the Human Resources Department that he overheard Harrison say "the black baby killers won all the elections." Clay testified that this comment was "the most blatant insult that I have heard in my life." Clay Dep. at 539. As a result of Clay's letter, Interstate's General Counsel and Vice–President, Human

---

of your probation, you may be subject to further disciplinary action up to and including termination." *Id.*

8. The reference here is plainly to the "Stepin Fetchit" character played by Lincoln Theodore Perry in the 1930s.

Resources, Carol Newman, and Sally Conneely, a Human Resources Representative, met with Clay to investigate the incident. Newman and Conneely also met with Harrison. Newman and Conneely concluded that the remark was inappropriate but that Harrison did not engage in intentional racial harassment. Harrison was given a verbal warning for making the inappropriate and careless remark. Clay was informed of this outcome. Def.'s Facts ¶¶ 50–53.

The final incident evidencing racial animus raised by Clay occurred in November or December 1989 and involved a high school mentoring program created by Interstate. Clay testified in his deposition that when a list of Interstate professionals was compiled for the mentoring program there was only one black employee out of approximately 25 names on the list. Subsequently, a meeting between approximately 12 black employees and Carol Newman was held. Clay spoke at the meeting and indicated that the black employees were offended by their omission from the list and by the fact that the list contained employees who were generally regarded as being hostile toward black employees. Clay Dep. at 470–75. In the end, Clay and other black employees participated in the mentoring program. Id. at 475; Def.'s Facts ¶ 56.

*Administrative Proceedings*

Clay filed separate charges of racial discrimination and retaliatory discharge with the Illinois Department of Human Rights. On April 25, 1994, Clay was issued a "right to sue" letter entitling him to institute a civil action with regard to his charge of racial discrimination. On September 1, 1994, he was issued a "right to sue" letter entitling him to institute a civil action with regard to his charge of retaliatory discharge. Clay filed his original complaint against Interstate on July 18, 1994 and filed an amended complaint on September 23, 1994.

*ANALYSIS*

*Summary Judgment Standards*

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Sample v. Aldi Inc.,* 61 F.3d 544, 546 (7th Cir.1995), and draw all inferences in the nonmovant's favor. *Kirk v. Federal Property Mgt. Corp.,* 22 F.3d 135, 138 (7th Cir.1994). However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. at 1348, 1356, 89 L.Ed.2d 538 (1986); *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Also, mere conclusory assertions, unsupported by specific facts, made in depositions or affidavits opposing a motion for summary judgment, are not sufficient to defeat a properly supported motion for summary judgment. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *First Commodity Traders, Inc. v. Heinold Commodities Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact.").

*Clay's Race Discrimination Claims*

Clay argues that his negative performance evaluation of September 1989, his probation of February 1, 1990, and his ultimate dis-

charge on August 16, 1990 were all racially motivated. Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 *U.S.C.* § 2000e–2(a)(1).

 The plaintiff's ultimate burden in a Title VII race discrimination action is to prove that he or she was discharged (or otherwise adversely treated in employment) on the basis of race. To do so the plaintiff may present either direct or circumstantial evidence of discriminatory intent. The latter might consist of evidence of suspicious timing or inappropriate remarks, or comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir.1994). Alternatively, a plaintiff may employ the *McDonnell Douglas* burden-shifting technique to raise an inference of illegal motive. *Id.*; *Sample v. Aldi Inc.*, 61 F.3d 544, 547 (7th Cir.1995); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To state a prima facie case of discrimination under the *McDonnell Douglas* method, Clay must establish that (1) he is within a protected class; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) employees not in the protected class were treated more favorably. *Sample*, 61 F.3d at 548; *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994); *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994). If the plaintiff succeeds in making this prima facie showing, a rebuttable presumption of discrimination arises and the burden of production shifts to the employer to articulate a legiti-

mate nondiscriminatory justification for its action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer meets its burden of production, the presumption is dissolved and the burden shifts back to the plaintiff to prove that the proffered reasons are a pretext for discrimination. *Id.* at 256, 101 S.Ct. at 1095. Pretext may be established by showing either that a discriminatory intent more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. At all times, the plaintiff retains the ultimate burden of persuasion that he was the victim of intentional discrimination. *Id.*

 Under the *McDonnell Douglas* shifting-burden approach (upon which Clay proceeds), the plaintiff must first establish a prima facie case of discrimination before the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's treatment. In the instant case, the parties dispute whether Clay can satisfy the prima facie showing; in particular, they dispute whether Clay was meeting Interstate's legitimate expectations. It is unnecessary to address whether Clay has established his prima facie case, for it is clear that Interstate has met its burden of articulating a legitimate nondiscriminatory basis for its employment actions concerning Clay—namely, deficient performance. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Therefore, the Court will assume that a prima facie case has been established and will consider the evidence offered by Clay to show that Interstate's nondiscriminatory justification for its actions is a pretext for racial discrimination.[9]

9. In its motion for summary judgment, Interstate argues that the only employment decisions at issue are the discharge and retaliation claims. In his response to this motion, Clay places in issue his negative performance appraisal from September 1989, and his probation of February 1990. In this regard, Clay raises what he regards as the "peculiar timing exhibited by Defen-

dant's evaluation and discipline of Plaintiff." See Plaintiff's Resp. to Def.'s Mot.Summ.J. at 11. Thus, while Interstate raises Clay's poor performance as its nondiscriminatory justification for Clay's termination, Clay charges that the predicate circumstances (his poor reviews and probation) were themselves discriminatory adverse employment actions. Interstate does not specifi-

### 1. Clay's Negative Performance Appraisal of September 1989

Clay contends that the negative performance appraisal he received in September 1989 from Trandel was racially motivated. In support of this contention, Clay argues that the discriminatory origin of this unfavorable evaluation is evidenced by the fact that the evaluation was given after he experienced and/or complained about two discriminatory acts: (1) Trandel's "you people" remark; and (2) the memorandum written by McDonald complaining about Clay's failure to respond in a timely fashion to word-processing requests for blank drafts.

■ With respect to McDonald's complaint (and Trandel's subsequent directive to Clay to deliver the drafts within 15 minutes of the request), Clay finds discriminatory animus in the purported facts that he was the only non-white employee who was involved in the incident and that he was not treated on an equal basis with white employees who were involved. Pl.'s Add'l Facts ¶ 22; Clay Dep. at 530–31. There is, however, no evidence in the record to support this contention. In the first place, besides the conclusory assertion itself, there is not a shred of evidence in the record to suggest that anyone but Clay was involved. In fact, the record is to the contrary. McDonald's memorandum to Trandel reads as follows:

> Today, Christina called Greg and told him how many drafts she needed. She also went over to his desk to request CNA drafts. He Said OK. She went to pick up the drafts, they were not there and Greg was at a meeting. Charles Barthelme wanted his drafts completed before 12:00 noon. Christina also has INC drafts which need to be typed.
>
> This has held up the draft processing (at a time when typists are very busy). It would have been appreciated if he at least

had told Christina he was going to a meeting and had not gotten the drafts yet. Def.'s Facts, Ex. 8.[10]

Clay baldly asserts, without any effort to adduce evidence, that others were involved in the incident and that he was not treated equally with the white individuals who were involved. However, it is clear from McDonald's memorandum that Trandel received a complaint regarding Clay, and no one else, based on a request made specifically to Clay by a word-processor. Thus, discriminatory animus cannot be ascribed to Trandel for "reprimanding" Clay and no one else. Furthermore, there is no evidence in the record that anyone else was involved or that Trandel was aware that anyone else was involved (if that was indeed the case). If Clay's claim is that McDonald was acting with discriminatory animus in singling Clay out in her memorandum while the problem of not responding promptly to requests for drafts was not limited to Clay alone, we again find that there is no evidence in the record to this effect. In short, we find not a hint of racial animus in the McDonald complaint episode and further find that it does not establish even colorable evidence relating to Clay's September 1989 evaluation.

■ Turning to Trandel's "you people" remark, we begin by noting that it is very far from clear that the remark was a racial slur as Clay contends. Clay and White both declined to don the fedora and sunglasses, and there is no question that Trandel was referring to both Clay and White collectively; thus, it is just as likely that the expression "you people" was used because Trandel was referring to more than one person (as in the expression "you guys" which would have less than precise in the instant case given White's gender) as it is that Trandel used the expression to refer to African–Americans. Of course, the Court is not unmindful of the fact that expressions such as "you people" and

cally address Clay's contentions in this regard. Nevertheless, it is clear to the Court that Interstate's uncontroverted evidence not only defeats Clay's discriminatory discharge claim but also any claim Clay might have as to these other adverse employment actions.

**10.** In response, Trandel sent Clay a memorandum on July 31, 1989 informing him that it was his responsibility to send drafts within 15 minutes of word processing's request. Def.'s Facts, Ex. 9. Trandel's memorandum further states, "If you are unable to do so, please have Joe or Dave take care of getting your drafts." *Id.*

"your kind" are sometimes used to refer to a race as a group. And, certainly, if the object of Trandel's remarks were a single person, the use of the expression "you people" could much more readily support the inference Clay draws. Here, however, because Trandel was referring to two people, the expression, "you people" is, at worst, hopelessly ambiguous. Because this matter is before the Court on Interstate's motion for summary judgment, we must draw all reasonable inferences in Clay's favor. Therefore, the Court will accept for purposes of deciding this motion that Trandel's remark was a reference to Clay and White's race and hence constitutes evidence of racial animus. *But see EEOC v. Alton,* 901 F.2d 920, 924 (11th Cir.1990) (finding the statement "you people can't do a _____ thing right" to be "the type of stray remark contemplated by Justice O'Connor"); *Ross v. Communication Workers of America, Local 110,* 1995 WL 351462 *3 (S.D.N.Y.1995) (finding remarks concerning "you people" to not rise above a stray remark in view of its vagueness). Even after drawing this inference in Clay's favor, the Court finds the remark insufficient to raise a genuine issue of material fact as to whether Clay's September 1989 performance evaluation was the product of racial discrimination.

Clay has adduced no evidence to refute any of the performance deficiencies noted in the appraisal or to refute Trandel's chronicle of deficient performance contained in Trandel's affidavit. Specifically, Clay does not dispute that he failed to learn SMS input until September 1989, he does not dispute that he failed to resolve the SMS problems to Trandel's satisfaction, he does not dispute that he did not learn the account receivables clearing reconciliation procedure, nor does he attempt to dispute Trandel's appraisal concerning his supervisory shortcomings. Clay responded to his evaluation in writing, contending that it was "distorted and unfairly subjective," "unjustified" and "evidence of the unprofessional, biased, and unjust treatment I've endured." Def.'s Facts, Ex. 13. Clay further notes his feeling that he has "behaved commendably." *Id.* However, Clay's own appraisal of his performance is insufficient to raise a genuine issue of material fact. In the final analysis, the evidence of Clay's unsatisfactory performance supporting the performance evaluation is abundant and uncontroverted (if not admitted).

Against this evidence, Clay looks to the "you people" remark as evidence of discriminatory animus. We cannot find that this remark was anything but a stray remark—made in a context wholly unrelated to the adverse employment action about which Clay complains—that is insufficient to raise a genuine issue of material fact concerning racial discrimination. The Seventh Circuit has repeatedly cautioned that evidence of a supervisor's isolated use of a slur directed at an employee's race, ethnicity, or national origin does not, by itself, suffice to establish a genuine issue of material fact unless the remarks are made relatively contemporaneously with the adverse employment action and are related to that action. *See e.g., Hong v. Children's Memorial Hosp.,* 993 F.2d 1257 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1116 (7th Cir.1992); *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991).

There is no dispute that Trandel's remark was an isolated event, as Clay admits that this comment was the only racially derogatory comment made by Trandel or any other member of Interstate's management. Pl.'s Facts ¶ 47. The record does not establish the exact date of Trandel's remark, although it does reflect that it was made in September and Clay's testimony is that it preceded Trandel's evaluation. Clay Dep. at 216–17. Therefore, we can conclude that the remark was relatively contemporaneous with the September evaluation. Thus, we must consider whether Trandel's remark bears a sufficient nexus to Clay's performance evaluation to raise a genuine issue of material fact. This is where Clay's showing evaporates. Trandel's remark was uttered in a very specific context unrelated to Clay's performance evaluation and there is no indication that the performance evaluation directly or indirectly incorporated the sentiments embodied in Trandel's alleged statement—there is no reference, for example, to Clay being a trouble maker. At most there is a statement that Clay "often lacks diplomacy when dealing

with co-workers" but this comment cannot reasonably be tied to Trandel's remark because the same sentiment was expressed in his evaluation a year earlier. *See* Def.'s Facts, Ex. 2 ("Needs to show more diplomacy when dealing with subordinates.") On his part, Clay has presented no evidence that Trandel's remark was related in any way to the negative performance appraisal.[11] Accordingly, we find that Trandel's remark is not sufficiently related to the adverse employment action complained of to raise a triable issue as to discrimination. Even if we were to conclude that this remark amounted to more than a stray remark, we would still conclude that Clay has not raised more than a metaphysical doubt as to whether his negative performance appraisal was a product of racial animus in view of his admissions concerning his deficient performance.

■ Finally, we note that in his response to the motion for summary judgment, Clay vaguely compared his treatment between 1988 and 1989 with the treatment of a fellow supervisory employee, Joseph Smith, noting that while he was treated poorly during this period, Smith was treated "great." Clay also specifically observed that while he received a "2" on his appraisal in September 1989, Smith received a "3.9". Apparently, Clay is attempting to contrast his treatment with a similarly situated white employee (Smith). However, Clay's suggestions in this regard are strictly conclusory and unsupported by any evidence. Clay presents absolutely no evidence that Smith was similarly situated in terms of employment duties and/or performance deficiencies at the time of the appraisals. Therefore, Clay's allusions to Smith cannot be considered probative of discriminatory animus.

### 2. Clay's Probation of February 1, 1990

■ Clay also contends that his being placed on probation on February 1, 1990, was an instance of discriminatory treatment. Here, Clay's position is that the probation was effectively in retaliation for his complaining about two occurrences (1) the racially

derogatory remark made by employee Brian Harrison on November 9, 1989; and (2) Interstate's omission in November or December 1989 of black employees from a list of potential volunteers for a high school mentor program.

Besides the fact that Clay's complaints about these issues preceded his probation by two to three months, there is absolutely no evidence in the record connecting Clay's complaints to his probation. As in the preceding analysis, Clay admits the numerous performance deficiencies articulated by Interstate as the basis for his probation. Most significantly, Clay does not controvert the evidence pertaining to his repeated deficiencies with respect to the accounts receivable reconciliation process and the problems with SMS errors. *See* Pl.'s Facts ¶ 24–30. Clay was told in his September 1989 appraisal that he was to complete the reconciliations. Clay admits that he was then consistently reminded about this obligation in a memorandum by Trandel dated November 16, 1989, and through meetings with Trandel on December 5, and January 26, 1990. Clay also admits that despite these reminders, he still failed to respond and had not completed the reconciliation work as of February 1, 1990. Also, Clay was informed as early as August 1988 that he needed to work on correcting SMS system problems. Again, Clay does not dispute that he was consistently reminded of this responsibility but failed to complete the work to Trandel's satisfaction. While Clay managed to learn SMS input procedures, he still failed to document and correct SMS system problems as he was instructed.

In view of the complete absence of evidence connecting Clay's complaints to his probation and the uncontroverted evidence pertaining to his persistent deficient performance with respect to the reconciliation process and the SMS system, the Court finds that Clay has failed to raise a triable issue with respect to whether his probation was racially motivated.

---

11. The Court recognizes, however, the difficulty of presenting evidence of such a nexus in view of the fact that employers rarely are so careless as to make the connection between their racism and their employment decisions explicit.

*3. Clay's Termination on August 16, 1990*

Finally, Clay alleges that his termination was the product of race discrimination. In view of all of the foregoing, it is not necessary to discuss this claim in great detail, for it advances no new arguments. At this point it is sufficient to note that Interstate has offered a nondiscriminatory justification for Clay's termination (deficient performance) that is amply supported by the record. Clay does not materially controvert any of the evidence supporting Interstate's position. And, the affirmative evidence Clay raises in an effort to show that Interstate's justification is pretextual (which we have discussed above) falls far short of the mark. By the time Interstate terminated Clay, he had been put on probation twice for deficient performance. (We note in passing that Clay does not appear to argue that his second probation was motivated by discriminatory animus.) Accordingly, we conclude that Clay has failed to raise a genuine issue of material fact as to whether any of the adverse employment actions taken against him were racially motivated. Therefore, Interstate is entitled to summary judgment on Clay's claims of racial discrimination under Title VII.

*Clay's Claim of Retaliatory Discharge*

Clay also claims that he was discharged in retaliation for filing a charge of discrimination with IDHR. Title VII makes it unlawful:

> for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 *U.S.C.* § 2000e–3(a).

The *McDonnell Douglas* burden-shifting analysis is also applicable in retaliatory discharge claims. *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994); *Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1114 (7th Cir.1992). To establish a prima facie case of retaliatory discharge, the plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by his employer; and (3) there is a causal link between the protected expression and the adverse action. *Jennings v. Tinley Park Community Consolidated School Dist. No. 146,* 796 F.2d 962, 967 (7th Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987). The first two prongs of this test have plainly been met. Interstate does not challenge this conclusion. However, Interstate contends that Clay cannot prove a causal connection between his filing of a charge of discrimination his discharge.

It has been held that, generally, a plaintiff may establish the necessary causal link through evidence that the discharge took place on the heels of protected activity. In *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989), the court stated that "[w]hen employing the indirect method to show a causal link, the sequence of events is especially telling, and evidence that the adverse action was temporally close to the protected expression may be sufficient to establish the causal connection." *See also Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1458 (7th Cir.1994); *Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991); *Collins v. State of Illinois,* 830 F.2d 692, 705 (7th Cir.1987). The operative language here is "may be sufficient"; thus, the temporal proximity between the filing of a charge and an adverse employment action does not *per se* suffice to establish the requisite causal connection and the present case nicely illustrates why this must be so. Clay was well aware of the fact that he was already on probation when he decided to file his charge of discrimination. Clay also knew that Interstate was to reevaluate his employment status at the end of his probationary period. Interstate was notified of Clay's charge of discrimination one week before Clay's probationary period ended. If temporal proximity were *per se* sufficient to establish the requisite causal connection, Interstate would be effectively straightjacketed by Clay's decision to file a charge of discrimination while on probation. If mere temporal proximity were sufficient, the only way Interstate could avoid placing itself in the posture of having to defend against Clay's claim of retaliation would be to delay the inevitable for some

undefined time in order to interrupt the proximity in time. The law does not require this. We believe that under the facts of this case, where the employer was informed of the protected activity of its employee days before it was set to reevaluate the employee's performance, temporal proximity standing alone is not sufficient to establish a prima facie case of retaliation.

 The foregoing remarks are largely academic, however, for in the instant case, it makes no difference if we conclude that a prima facie showing has been met—for Clay cannot rebut Interstate's nondiscriminatory justification for terminating Clay—poor performance. Clay must "produce evidence from which a reasonable factfinder could infer that Interstate lied about its proffered reason for the dismissal." *Schultz v. General Electric Capital Corp.*, 37 F.3d 329, 333 (7th Cir.1994). However, Clay admits that during his second probationary period:

> Clay again failed to inform management of an extraordinary capital gain, failed to notify Trandel about a $2 million cash transfer he had requested from the parent company, and failed to report a $1,276,049.19 wire transfer from the parent company. In addition, Clay had not been supervising an intern, and had missed deadlines for completing a bank directory and accounts receivable reconciliations.

Def.'s Facts ¶ 41. In view of these uncontroverted facts, Trandel recommended that Clay be terminated, and her recommendation was approved. Interstate was free to exercise its business judgment as it saw fit in this regard, and this court will not second guess its judgment on personnel matters. The federal courts do not sit as super-personnel departments reevaluating business decisions that might be mistakes or exercises in poor business judgment. *Kralman v. Illinois Dept. of Veteran's Affairs*, 23 F.3d 150, 152 (7th Cir. 1994), cert. denied, —— U.S. ——, 115 S.Ct.

359, 130 L.Ed.2d 313 (1994). We are concerned only with whether there is evidence of discriminatory animus, and in this case we find none.[12]

The undisputed facts in this case reveal that Interstate, through Linda Trandel, fully informed Clay of the deficiencies in his performance and gave him every opportunity to correct them. Clay failed to take advantage of these many opportunities and he was eventually terminated. We conclude that Clay has failed to adduce evidence that would allow a rational trier of fact to conclude that he was discriminated against or discharged in retaliation for filing a charge of discrimination. Therefore, Interstate is entitled to summary judgment on Clay's complaint.

### CONCLUSION

Defendant Interstate National Corporation's motion for summary judgment is granted in its entirety. Judgment is hereby entered in favor of Interstate National Corporation and against Gregory A. Clay. This complaint is dismissed with prejudice. Each party to bear their own costs.

---

**12.** Although Clay makes no effort to develop a claim for racial harassment, we note for the sake of completeness that Clay's evidence regarding episodes of racial harassment that he experienced at Interstate fall far short of establishing a hostile work environment within Title VII's purview. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264 (7th Cir.1991) (articulating the standards for a racial harassment claim). In reaching this conclusion we have considered all of the events that Clay has described in their totality. Thus, we conclude that Trandel's remark, Harrison's remark (and the reprimand he received), the mentor list incident (and Interstate's response) and the McDonald complaint incident taken collectively cannot meet the objective and subjective standards articulated in *Daniels*.