Gene M. AUSTON, IV, Plaintiff–
Appellant,

v.

Tom SCHUBNELL et al., Defendants–
Appellees.

No. 96–1132.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1996.

Decided June 18, 1997.

Gene M. Auston, IV, Captain (argued), Evanston, IL, pro se.

Frederick T. Smith (argued), Joan E. Gale, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Before CUMMINGS, COFFEY, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Captain Gene Auston worked for a period of time at Children's Memorial Medical Center (the Hospital) as a weekend day staff nurse. In 1992, he was involved in two car accidents, in both of which he suffered injuries serious enough to require him to take a

leave of absence from his job. His problems arose when he attempted to extend his time off from the second leave. After a lengthy period of negotiations, grievance procedures, and discussions with hospital personnel, Austin's employment with the Hospital was terminated. He then filed this suit in state court under Title VII and the Americans with Disabilities Act, claiming that he had suffered sex discrimination and discrimination on account of a perceived disability. He also asserted six supplemental state claims, for breach of contract, wrongful termination, misrepresentation, "tortious acts of bad faith and possibly fraud," intentional infliction of emotional distress, and tortious interference with contract. The Hospital removed the action to federal court, where in due course the district court granted the Hospital's motion for summary judgment and dismissed certain other claims that Auston had abandoned. We agree that Auston failed to raise a genuine issue of fact on any of the claims that are still in the case, and we therefore affirm.

Because we are reviewing the district court's grant of a motion for summary judgment, we present the facts in the light most favorable to Auston. *Schmidt v. Methodist Hospital of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir.1996). Before joining the Hospital's staff, Auston had been living in Fort Knox, Kentucky. When he learned of the open position at the Hospital, he interviewed with defendant Tom Schubnell, the Clinical Nurse Manager for the Operating Room. During the interview, Schubnell told Auston that if Auston accepted the position of a weekend day nurse (under a special incentive pay system known as the Baylor program) and if he deferred his plans to attend law school for a year, he could have a job at the Hospital until he graduated from law school. Under the Baylor program, the Hospital was entitled to provide incentive pay to part-time weekend nurses working at a .6 full-time equivalent (FTE) level, in selected weekend positions. The program was designed to make it easier to find staff willing to work 12–hour shifts on weekends. Some time after this interview, the Hospital offered Auston the Baylor weekend position, and he accepted, beginning work in September 1991.

For the first nine months or so, the Hospital placed Auston in an orientation and training program. In the Spring of 1992, he began working the two 12–hour shifts in the weekend day-time Baylor position in the Operating Room that he and Schubnell had discussed. In September 1992, again as contemplated, he began law school. Not long afterwards, on September 30, 1992, he was involved in the first of the two car accidents that affected his job. He did not take a leave of absence immediately, but he did request and take a leave without pay in March and April 1993, in order to undergo surgery to correct an injury he had suffered in the September accident. After his leave expired, the Hospital returned him to his weekend day-time Baylor position.

In June 1993, Auston was involved in another car accident. This time, he called Schubnell, who was his supervisor, and told Schubnell that he would be unable to work. Auston concedes that the Hospital had at the time a written policy on leaves of absence without pay. Employees requesting such a leave must apply for it after all their paid leave time has been exhausted and if they expect to be absent for more than ten working days. Applications must be in writing, properly documented, and submitted "well in advance" of the first unpaid day. The policy also stated that the Hospital did not guarantee reinstatement to anyone returning from medical, educational, or personal leave. Instead, placement would depend on the availability of a job. If no suitable position could be found within one month, the employee would be considered laid off and his employment at the Hospital terminated.

In keeping with this policy, Schubnell wrote to Auston on June 30, 1993, and told him that effective July 4, 1993, his paid leave would expire and he would need to apply for an unpaid leave. Schubnell's letter also clearly stated that Auston would need to submit a physician's note to support his application, and that Auston would need to meet with Schubnell to negotiate his staffing hours. The letter also informed Auston that he would need to work weekday shifts, either from 7:00 a.m. to 3:00 p.m., or from 7:00 a.m.

to 5:00 p.m., whichever was better. (Presumably the longer shifts would have permitted Auston to accumulate his 48 hours per pay period with fewer days in the Hospital per week.) Notwithstanding this letter, Auston did not provide the physician's note Schubnell had requested, nor did he specify how long he wanted to remain on leave. He did write on July 7, 1993, to confirm that he wanted a leave of absence and that he wanted to retain his .6 FTE position.

While Auston was on leave, other employees took over his duties in the Operating Room. The Hospital did not place the substitutes in the Baylor program. To the contrary, it decided to eliminate the Baylor position that Auston had filled, as part of a broader program of labor cost containment. Auston disputes the Hospital's contention that it intended ultimately to eliminate all the Baylor positions, pointing out that Karen Anderson, Director of Nursing, Operating Room Services, who would have had a key role in deciding whether to do away with OR Baylor positions, testified in her deposition that she "could not even state that a decision to eliminate a Baylor position in the OR had been reached prior to May, 1994." He also contends that the Hospital continued the Baylor program and "hired new Baylors" long after his termination. He does not, however, dispute the broader fact that the Hospital was reducing those positions overall during the relevant time period.

On September 15, 1993, Schubnell wrote to Auston informing him that his employment had been terminated effective September 20, 1993, because of his failure to supply medical documentation to the Hospital in support of his leave and his failure to communicate with Schubnell since his July 7 letter. Far from ending matters, Schubnell's September 15 letter was the beginning of a lengthy process during which Auston challenged the Hospital's decision in every way available to him. Briefly, Auston protested Schubnell's decision, pointing out that Schubnell had promised to discuss his status once he was medically released to work. Defendant Jamie O'Malley, Vice President of Patient Services, met with Auston, investigated his case, and decided that Schubnell's letter was ambiguous. She therefore reinstated Austin to the .6 FTE position and extended his leave until December 7, 1993.

Not content with that, Auston wrote to Defendant Jeanne Martin, the Hospital's Director of Employee Relations, and complained that the Hospital was violating numerous laws. He alleged in that letter that he was not being treated as favorably as another employee, Sue Lee, who was still receiving Baylor pay in a weekend night position. (Lee, the Hospital noted later, had never taken a leave of absence.) Auston's discussions with Martin eventually led him to file a formal grievance with the Hospital. After a formal hearing, the grievance panel decided to reinstate him, to delete any reference to his termination from his file, and to grant him two additional months of leave beginning November 2, 1993. The panel did not grant his request to be assigned to a supervisor other than Schubnell, and it said nothing about his Baylor position.

Shortly after the panel reached its decision, Martin told Auston that he would no longer work in the weekend position or receive Baylor pay. Schubnell decided instead to place Auston in a weekday, non-Baylor position. Auston took the news badly, writing a letter on December 15, 1993, to Defendant Theodore Leiterman, Executive Vice President of the Hospital, threatening to sue on a variety of grounds if he were not returned to the precise job he had before his leave. Letters and threats continued during December, culminating with a meeting between Martin and Auston on December 29 at which Martin told him not to come to work on Saturday, January 1, 1994, but to come instead on January 7. Auston did not show up on the 7th, and Schubnell promptly terminated his employment effective February 1, 1994.

This lawsuit followed, in which Auston sued the Hospital and six individual defendants: Jan Jennings, President; Laura Lingl, Risk Manager; Leiterman; O'Malley; Martin; and Schubnell. Once it reached the federal district court, Auston informed Judge David H. Coar that he was proceeding only on his claims under Title VII, breach of contract, promissory estoppel, and (against

Schubnell only) tortious interference with contract. The district court accordingly dismissed the remainder of his claims with prejudice. We too will disregard the claims he abandoned in the district court, as he has not attempted to revive them here (and we doubt that he could if he tried).

Auston's Title VII sex discrimination claim is based on his assertion that the Hospital treated him less favorably than it did similarly situated women. He does not claim, however, that he had direct evidence of sex discrimination, aside from an unsubstantiated claim not made before the district court that Schubnell harbored discriminatory animus because Auston had rebuffed homosexual overtures from Schubnell. Aside from failing to call the district court's attention to this allegation, Auston has not included anything pertinent to that claim in his argument on appeal. We therefore consider it waived. *Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988).

■ Auston's principal argument relies on the well known *McDonnell Douglas* indirect method of proof. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343 (7th Cir.1997). As a male, Auston is a member of a protected class, and the Hospital is not for these purposes disputing his qualifications for the job. It argues, however, that Auston did not come forward with competent evidence to show that any similarly situated women were treated more favorably than he was. The district court agreed with this assessment, and so do we. The fact that Sue Lee may have retained her Baylor position longer than Auston did is not helpful, as Lee did not take a protracted leave of absence and was therefore not "similarly situated." See *Timms v. Frank*, 953 F.2d 281 (7th Cir.1992). In fact, Lee's Baylor position was eliminated in December 1994, in keeping with the Hospital's general program of reevaluating the need for special incentive pay positions. Auston also argues that his weekend day Baylor position was the only one eliminated in September 1993, whereas some 53 other Baylor positions, all staffed by women, continued into 1994. He claims that women returning from leaves of absence were either placed into Baylor positions or were returned to them. He has not supported the latter arguments with any references to the record, however, as is his obligation on summary judgment. We cannot tell whether any or all of these other 53 people were in the same department as he, reported to the same supervisor, worked the same hours, were returning from leaves of absence, or were otherwise similarly situated.

■ If this were not enough, it is also clear on this record that the Hospital articulated a legitimate, nondiscriminatory reason for terminating Auston, namely, his refusal to work during the hours that were assigned to him. It appears to us that the Hospital bent over backwards in its efforts to be fair to Auston, but that Auston himself was not willing to accept anything less than the identical position he had held before his leave. The Hospital's leave policy, as Auston concedes, did not entitle him to this treatment. Even assuming that Schubnell and other Hospital officials knew that it would be more difficult for Auston to keep up with his law school classes if he was working weekdays, this does not amount to any form of discrimination against Auston, nor does it suggest that the Hospital's stated reason for terminating him was pretextual.

■ Although Auston claimed before the district court that the Hospital retaliated against him because he stated that he would exercise his First Amendment rights to protest his allegedly discriminatory treatment, the district court found that this claim was barred for failure properly to exhaust his administrative remedies. A Title VII plaintiff may not bring claims in a lawsuit that were not fairly included within his EEOC charge. Here, Auston did not check the retaliation box on the charge form, nor did his account of the facts include any reference at all to retaliatory conduct. We agree with the district court that this did not suffice to provide a basis for a claim under Title VII based on retaliation. See *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992). Although at one point Auston was pursuing a state law claim based on retaliatory discharge, this was one of the theories he

abandoned in the district court. We thus have no need to consider it further.

Auston also claimed that the Hospital had a contract with him, enforceable under Illinois law, to employ him until he finished his law school education. The district court rejected this both because the contract was not in writing, and thus was barred by the Illinois Statute of Frauds, and because any such contract was not supported by adequate consideration. Auston does not dispute the fact that his alleged contract was oral, and he recognizes that "oral employment contracts are viewed more skeptically than written ones." *Tolmie v. United Parcel Service, Inc.*, 930 F.2d 579, 581 (7th Cir.1991). His case is different, he believes, because his oral contract fell within the partial performance exception to the Statute of Frauds. *Anastaplo v. Radford*, 14 Ill.2d 526, 153 N.E.2d 37, 43 (1958); *Vail v. Board of Education of Paris*, 706 F.2d 1435, 1440 (7th Cir.1983). Furthermore, the Hospital failed to raise the Statute of Frauds as an affirmative defense, as it must under Fed.R.Civ.P. 8(c). The district court nevertheless relied on this ground to dismiss the claim, and we too will comment on it, although it is not central to our decision. Auston argues here that the Hospital partially performed the promise, which would take the matter outside the Statute of Frauds. Even if the Hospital employed him, it is hard to see what steps it took that related to the specific promise on which Auston relies, which amounts to a guarantee of nontransferability and permanent Baylor status until he finished law school. Shortly after he started law school, his problems with the leaves of absence began, and the Hospital's conduct throughout that time period indicated that it did not believe itself to be bound by any such commitment.

■ The non-written nature of Auston's contract is not its worst flaw. The more fundamental problem is the lack of consideration underlying Schubnell's statements, assuming that he was empowered to act as the agent for the Hospital. As the district court said, it is hard to conceive of a rationale that "would somehow make Auston's deferral of the first year of his law school education a benefit for the Hospital." Auston certainly does not provide any help to the court in answering this question; he provided no citations or evidence either before the district court or here to answer the Hospital's assertion that the contract was not supported by consideration. This is not enough to overcome the presumption in Illinois law that one is an employee at will. See *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 176 Ill.Dec. 22, 30, 601 N.E.2d 720, 728 (1992); *Hanna v. Marshall Field & Co.*, 279 Ill.App.3d 784, 216 Ill.Dec. 283, 287, 665 N.E.2d 343, 347 (1st Dist.1996).

■ Auston also fails on his claims of promissory estoppel and tortious interference with his employment contract (brought only against Schubnell). He did not include the promissory estoppel claim in his complaint or his amended complaint, adding it only at the summary judgment stage. This is too late in the day to be adding new claims. Furthermore, Auston's unilateral expectation of job security cannot be enough to bind the Hospital, in the absence of some showing that it was receiving a particular benefit from the commitment to employ him in the .6 FTE Baylor position throughout his law school career. Auston's claim against Schubnell for tortious interference with his employment contract fails as a result of our finding that no valid and enforceable contract existed between Auston and the Hospital on the terms Auston alleged. See generally *Muthuswamy v. Burke*, 269 Ill.App.3d 728, 207 Ill.Dec. 50, 54, 646 N.E.2d 616, 620 (1st Dist.1993), *appeal denied*, 162 Ill.2d 570, 209 Ill.Dec. 803, 652 N.E.2d 343 (1995).

Disappointed job expectations are not always the result of venal or discriminatory actions on the part of employers. We do not doubt that Auston was disappointed when his hopes for his position at the Hospital were dashed after his second car accident and injuries, but his problems were largely self-inflicted. He did not comply with the Hospital's leave policy, nor was he justified in assuming that he had an unshakeable right to remain in the Baylor weekend day-time shift position throughout his law school ca-

reer. We AFFIRM the district court's judgment.