**Riccardo MORA, Plaintiff,**

**v.**

**CHICAGO TRIBUNE, Defendant.**

**No. 98 C 5270.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 3, 1999.

Robert R. Cohen, Frankel & Cohen, Chicago, IL, for Riccardo Mora, plaintiff.

John W. Powers, Sheldon Leigh Jeter, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Chicago Tribune Company, defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Riccardo Mora sued the Chicago Tribune (the "Tribune") for racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Mora alleges that the Tribune terminated him because he is Mexican–American, and because he filed a charge of discrimination with both the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). Currently before the Court is the Tribune's motion for summary judgment.[1] For the reasons stated below, the Court grants the Tribune's motion.

1. Defendant also filed a Motion to Strike Plaintiff's Rule 12(N)(3)(A) Response. We acknowledge that Mora failed to strictly comply with Local Rule 12 N, which requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir. 1994) (the mere denial of a particular fact without specific references to the affidavits, parts of the record, and other supporting materials that allegedly establish a factual dispute is insufficient; and, where a factual as-

## RELEVANT FACTS

The Tribune hired Mora as a route driver on August 6, 1986 to deliver newspapers to vendor boxes throughout Chicago and to retail customer accounts such as Walgreens and Osco stores. Route drivers are responsible for delivering new papers, gathering old papers, and collecting money from the Tribune's retail customer accounts. Drivers are assigned a labor service helper to assist with newspaper deliveries.

The Tribune expects its route drivers to complete their initial deliveries by approximately 7:00 a.m. (Pl.'s Dep. 207; King Dep. 219–21.) Because sold-out vendor boxes represent potential lost sales to the Tribune, route drivers return to low or sold-out vendor boxes once they complete their initial delivery schedule. (Pl.'s Dep. 186.) The Tribune encourages each route driver to complete this cycle within his or her eight-hour shift. (Pl.'s Dep. 186.)

### A. Mora's Initial Termination

On March 5, 1993, Kevin King, the Tribune's Distribution Manager, discharged Mora for an uncorrected route balance shortage, claiming that Mora wrongfully withheld cash receipts. (King Dep. 28).[2] According to King, if a driver has a route balance shortage on his collections, the Tribune generally gives the driver a short period of time in which to correct the balance and, if he or she fails to do so, terminates the driver until the route balance shortage is paid, at which time the

sertion is met with such a naked denial the fact may be admitted.) Because we find that Defendant is entitled to summary judgment regardless of the outcome of this motion (23–1), we deny the motion as moot.

2. Kevin King was employed by the Tribune from November 11, 1980, until he resigned on February 28, 1997. From January 1989 until his resignation, King was the Tribune's Distribution Manager. In his position as Distribution Manager, King was in charge of discipline for all drivers. (King Dep. 4, 7–8.)

driver is typically reinstated. (King Dep. 169, 186–87.) Prior to his discharge, the Tribune warned Mora that "[f]ailure to abide by [certain] procedures [involving the collection and use of the Tribune's monies] could result in disciplinary action including termination." (Pl.'s Dep. Ex. 11.) Following his discharge, Mora began to pay back the route balance shortage. (King Dep. 58–60.)

On July 9, 1993, Mora filed a charge of discrimination with the IDHR and the EEOC alleging that the Tribune discharged him on March 5, 1993 because of his Mexican–American ancestry. (Pl.'s Dep. Vol. III at 284; King Dep. Ex. 4.) The Tribune received notice of this charge in 1993. (Pl.'s Resp. to Def.'s 12(M) Statement 11.)

Mora then grieved his termination pursuant to the collective bargaining agreement between the Tribune and the Teamsters Union Local 706 ("Union"). In a decision dated May 6, 1994, Labor Arbitrator Edward P. Archer determined that the Tribune had neither just cause nor clear and convincing evidence to believe that Mora was withholding cash receipts with the intent of stealing from the Tribune. (King Dep. Ex. 6.) Archer reinstated Mora, who returned to work at the Tribune on May 22, 1994 as a vacation relief driver.

## B. Mora's Performance Deficiencies

Approximately one year later, on or about May 15, 1995, Mora successfully bid to be the driver on Route 1511. (Pl.'s Dep. 175–77.) From the onset, Mora's new division boss, Jennifer Maher, was critical of Mora's performance. On June 26, 1995, Maher sent Mora a memo in which she claimed that 21% of the vendor boxes along Route 1511 were sold-out that day. (Pl.'s Dep. Ex. 20.) In addition, Maher claimed that Mora did not leave his route book in the "pigeonhole" at the end of his

shift,[3] (Pl.'s Dep. Ex. 20); a charge that Mora denied.

Two weeks later, Maher sent Mora a second memo in which she claimed that 37% of the vendor boxes along Route 1511 had been sold-out on July 10, 1995. (Pl.'s Dep. Ex. 21.) Maher also reprimanded Mora for again failing to leave his route book in the pigeonhole, noting that this was his second notice of this policy violation. (Pl.'s Dep. Ex. 21.) Mora again insisted that he left his route book in the pigeonhole and alleges that Tribune management never informed him of what it considers to be an "acceptable" level of sold-out vendor boxes. (Pl.'s Dep. 187.)

On December 4, 1995, King received notice that he was to appear at an IDHR fact-finding conference on February 1, 1996, regarding Mora's 1993 discrimination charge. (King Dep. 41.) King testified that he knew of Mora's charge of discrimination against the Tribune prior to receiving this notice. (King Dep. 41.)

At about the same time, Maher was growing increasingly dissatisfied with Mora and decided to contact her supervisors regarding Mora's performance. On December 13, 1995, Maher sent two memoranda to King. In the first memo, Maher notified King that Mora had requested two hours of overtime on Monday, December 11, 1995, despite her belief that he "[h]ad more than adequate time to return … before the end of his shift." (Pl.'s Dep. Ex. 24.) According to King, it is "somewhat unheard of" to receive two hours of overtime on a Monday route. (King Dep. 76–77.) In the second memo, Maher informed King that Mora had failed to balance his route book that day. (Pl.'s Dep. Ex. 22.) In addition, Maher noted that Mora had neglected to leave his route book in the pigeonhole, and explained that this was Mora's third violation. (Pl.'s Dep. Ex. 22.) In sending this correspondence, Mah-

**3.** A "pigeonhole" is a type of mail slot in which route drivers store their three "route books," so that the driver of the following shift can easily locate them. (Pl.'s Dep. 200.)

The "route books" contain monetary balances and newspaper delivery quantities for each particular route. (Pl.'s Dep. 184.)

er included copies of the earlier memos that she had written to Mora. (Pl.'s Dep. Ex. 22.)

On December 18, 1995, the Tribune transferred Mora and assigned Keith Fitzsimmons to be the Route 1511 route driver in accordance with the collective bargaining agreement between the Tribune and the Union.[4] The Tribune assigned Mora to a day-off position that included Fitzsimmons's days off on Route 1511. On January 5, 1996, the Tribune received two different customer service complaints regarding Mora, claiming that Mora had not delivered their newspapers. (Pl.'s Dep. Ex. 25.) One establishment had not received its papers by 7:50 a.m.; another business had not received its papers by 8:49 a.m. (Pl.'s Dep. Ex. 25.) Mora insists that delivery took longer than usual on that date because he had to learn a new route. (Pl.'s Resp. to Def.'s 12(M) Statement 19.) Mora explained that the Tribune had significantly altered Route 1511 since he was permanently assigned there, and that he ran the new Route 1511 for the first time on January 5, 1996. (Pl.'s Resp. to Def.'s 12(M) Statement 19.) In addition, Mora alleges that the weather was bad, and that the previous driver had not taken money out of the vendor boxes. (Pl.'s Resp. to Def.'s 12(M) Statement 19.) Nevertheless, on January 4, 1996, driver Gerald Walker completed the deliveries along the new Route 1511 by 7:30 a.m., even though this was his first day delivering that route. (Pl.'s Dep. 215–16.)

In response to customer complaints, King removed Mora from Route 1511 on January 5, 1996. Mora ran Route 1302 for two weeks as a vacation relief driver. The Tribune then offered to place him on Route 1205, a less demanding route by its estimation. According to the Tribune, Mora refused this offer and requested that the Tribune place him on Route 1310 in accordance with his seniority. On January 19, 1996, the Tribune met with Mora and his union representatives to discuss Mora's route assignment. The Union defended Mora's right to work Route 1310 pursuant to his level of seniority. Reluctantly, the Tribune agreed to place Mora on Route 1310, but made it clear that if Mora's performance problems continued, he would be subject to disciplinary action. (King Dep. Ex. 13.)

Despite this warning, Mora's performance problems persisted. Between January 22, 1996 and February 11, 1996, Mora requested overtime on Route 1310 ten out of the fifteen times that he drove the route. (Pl.'s Dep. Ex. 28.) The day-off driver, who drove the route nine times during the same period, never requested overtime. *Id.* To the Tribune's knowledge, no route driver had requested overtime on Route 1310 for ten years prior to Mora driving the route. (King Dep. 98.)

Mora admits that he requested the overtime, but states that the Tribune added twenty-nine stops in two additional suburbs around the time that he was assigned to Route 1310. (Pl.'s Dep. Vol. III at 308–09.) King removed Mora from Route 1310 on February 14, 1996. On February 16, 1996, King met with Mora and his union representatives and explained that Mora had taken "excessive time to run the route." (King Dep. Ex. 15.) Mora counters that after he was taken off Route 1310, Danny Keenan was paid overtime as the Route 1310 driver. (Pl.'s Dep. Vol. III at 309–10.) Nevertheless, the Tribune offered to assign Mora to a relay-driver position,[5] which is less demanding than the

---

4. On his first day driving Route 1511, Fitzsimmons completed the route at 7:30 a.m. (Pl.'s Dep. Ex. 23.) On his second and third days, Fitzsimmons completed the route before 6:00 a.m. (Pl.'s Dep. Ex. 23.) Conversely, Maher noted that "[d]uring the time that [Mora] ran route 1511, [his] normal route completion time was between 8:15 a.m. and 9:00 a.m." (Pl.'s Dep. Ex. 23.)

5. Relay drivers deliver bulk newspapers to agencies responsible for making home deliveries. (Pl.'s Dep. 179; King Dep. 51–52.) Relay drivers typically have only four or five stops per route and do not collect money on

route-driver position. (King Dep. 89.) According to the Tribune, Mora refused to accept a position as a relay driver, and began work on Route 1405 as a vacation relief driver. (Pl.'s Dep. 27,233.) Mora does not recall the Tribune offering him the relay driver position. (Pl.'s Resp. to Def.'s 12(M) Statement 22–23.)

On February 24 and 25, 1996, the Tribune received two complaints from Carol Tarpey of Tarpey's Pharmacy concerning Mora's slow delivery and bad attitude. (Def.'s Docs. Tab D Ex. 1.) Tarpey lodged an additional complaint about Mora's delivery service on Wednesday, February 28, 1996, complaining that she had not received her newspapers by 10:20 a.m. (Def.'s Docs. Tab D Ex. 2.) Mora argues that he delivered newspapers to Tarpey's Pharmacy in accordance with the route book for Route 1405. (Pl.'s Dep. 29–30; Pl.'s Dep. Vol. III at 302–03.)

## C. Mora's Mishandling of Company Property

In addition to performing poorly on his assigned route, the Tribune accused Mora of repeatedly mishandling company property. According to King, between December 26, 1995 and March 5, 1996, Mora damaged, destroyed, or lost five handheld, "Psion" computer units, which are used to record information about each specific route. (King Dep. Ex. 11, 22; Def.'s Docs. Tab D Exs. 4, 5.) The Tribune claims that Mora destroyed the first unit on December 26, 1995 when he placed it above the windshield of his truck and the liquid crystal display ("LCD") froze. (King Dep. Exs. 11, 22.) Division Manager Phillip Hall then assigned Mora a new Psion unit. On December 27, 1995, Hall rode with Mora to instruct him on the proper use of the device. At the close of the run, Mora placed this new unit into the "lock box" for his route. On December 28, 1995, driver Doug Applebaum went to use the Psion unit and discovered that it was damaged. (King Dep. Ex. 22.) The LCD was blanked out, and the outer case was cracked. (King Dep. Ex. 22.) Although Mora was the last driver to use the Psion unit, he denies damaging it. (Pl.'s Resp. to Def.'s 12(M) Statement 25.)

Operations Manager Tom Schager stated that he personally placed a Psion unit into the pigeonhole for Route 1405 on Sunday, February 18, 1996. (King Dep. Ex. 22.) When Division Manager Doug Berger met Mora on Monday, February 19, 1996, Mora claimed that the Psion unit had not been in the pigeonhole that morning. (King Dep. Ex. 22.) The unit was not located after searching the office. Mora denies any involvement with the loss of this third unit. (Pl.'s Resp. to Def.'s 12(M) Statement 26.)

On February 24, 1996, Mora lost a Psion unit after it bounced off the dashboard and out through the passenger side door of his truck after he hit a bump on the expressway. (King Dep. Ex. 22.) According to Mora, both the passenger side door and the mount that held the Psion computer unit were damaged and unusable. (King Dep. Ex. 22; Pl.'s Resp. to Def.'s 12(M) Statement 26.)

Mora allegedly turned in a damaged Psion unit at the end of his shift on March 5, 1996. (King Dep. Ex. 22.) According to the Tribune, part of the LCD was blanked out, and the outer case was cracked. (King Dep. Ex. 22.) Mora's helper on Route 1405, Jared Carter, reported to the Tribune that he had observed Mora repeatedly smash a Psion unit against the dashboard of their truck around February 26, 1996. (King Dep. Ex. 17; Def.'s Docs. Tab D Ex. 3.) Mora denies this charge. King testified that he was not aware of any other drivers who had as many problems with damaged or lost Psion units as Mora. (King Dep. 81–82.)

## D. Mora's Physical Altercation With a Co-Worker

One of the major incidents in this lawsuit involves a physical altercation Mora their route. (Pl.'s Dep. 179; King Dep. 51–52.)

had on February 21, 1996 with co-worker Jared Carter. While assigned to Route 1405, Mora's regular helper was Carter, who had been the helper on Route 1405 for ten years. On February 21, 1996, Division Manager Berger rode with Mora and Carter during delivery in order to further instruct Mora on how to use the Psion unit. During the ride, Mora and Carter disagreed about where to stack the return papers on the truck. (Pl.'s Dep. 238.) Mora claims that Carter threatened him by stating, "Man, I am going to get you. Just let me do my route." Berger, who witnessed this incident, did not consider Carter's comment to Mora to be threatening. (King Dep. Ex. 16.)

On February 26, 1996, Mora and Carter were servicing an Osco store—one of the Tribune's largest retail clients. While inside the store, Mora and Carter got into a heated argument. Mora admits that he "pushed" Carter, and then left Carter at the store. (Pl.'s Dep. Vol. II at 257–58.) After the altercation, Carter called the Tribune to report the incident. (King Dep. Exs. 17, 19.) He subsequently filed criminal charges against Mora. (King Dep. Ex. 17.)

Division Manager Hall picked up Carter at the Osco store. While at the store, Hall spoke with Osco clerk Diane Jones about the incident. Jones related that Mora had cursed at Carter, grabbed him, and shook him "like a piece of meat" before pushing Carter into her. (King Dep. Ex. 19.) She also informed Hall that Carter had cursed back at Mora. (King Dep. Ex. 19.) Jones, fearful of retaliation, refused to supply a written statement of her account, so Hall provided King with Jones's version of the incident. (King Dep. Ex. 19.)

King met individually with both Mora and Carter to determine what had occurred. According to Carter, when Carter refused to take the newspapers out to the truck, Mora began cursing and moving towards him, making statements such as, "[Y]ou won't be getting back on my m____r f___ing truck." (King Dep. Ex.

17.) Carter claimed that Mora then grabbed him, shook him, tore his sweater, told him not to get back on the truck, and drove away, leaving Carter stranded without his overcoat. (King Dep. Ex. 17.)

According to Mora, Carter cursed at him several times, made a fist, and moved towards Mora in a threatening manner. (Pl.'s Resp. to Def.'s 12(M) Statement 30.) Mora feared that Carter was going to hit him, and so he pushed Carter away from him. (Pl.'s Resp. to Def.'s 12(M) Statement 30.) Mora denied Carter's version of the events, claiming instead that he merely brushed away Carter's forearm in self-defense. (King Dep. 111.) Mora informed King that a Sun–Times driver, Joe Pisciola, and the Osco clerk, Diane Jones, witnessed the altercation. (King Dep. 111.) Mora also told King about Carter's alleged threat on February 21, 1996, offering Division Manager Berger as a witness. (King Dep. 113.) Mora refused to furnish a written statement detailing his version of the events before conferring with his union representatives. (Pl.'s Resp. to Def.'s 12(M) Statement 33–34.)

King told Mora that the Tribune would continue its investigation, and did not discipline Mora at that time. (King Dep. 111, 114; King Dep. Ex. 18.) King later testified that generally, if an employee is involved in a physical fight, the Tribune will investigate the incident and terminate the employee if there are independent witnesses to the event. (King Dep. 25.) Discharge is not automatic, however—the Tribune's investigation must reveal that the physical altercation was serious enough to warrant termination. (King Dep. 25 .)

Pursuing the leads that Mora had provided, King called Pisciola into his office to make a statement. According to Pisciola, both Mora and Carter began to swear at each other inside the Osco store. (King Dep. Ex. 55.) Mora then grabbed Carter and "shoved him about." *Id.* Carter broke loose and told the clerk to call security.

*Id.* At that point, Pisciola became uneasy with the situation and left the store. *Id.*

As part of his investigation into the Osco incident, King asked Berger to provide a written description of the verbal altercation between Mora and Carter on February 21, 1996. Berger described the disagreement on the truck, and told King that he did not believe Carter's remarks were threatening, but that Mora had "overreacted" to the situation. (King Dep. Ex. 16.) On February 28, 1996, King told Mora that his investigation had revealed that Carter had not previously threatened Mora. Mora asked that Berger be brought into the meeting to confirm that Carter had indeed threatened him. When Berger entered the room, King read Berger's statement denying that Carter's comments constituted threats, and Berger confirmed the statement. (King Dep.Ex. 16.)

Later that day, Berger returned to King's office and claimed that Mora, Berger's subordinate, had called him a "m_____r f____ing liar." (Def.Docs. Tab D Ex. 7.) When King questioned Mora about the slur, Mora claimed that he was referring to Carter, his route helper, not Berger, his superior. (King Dep. 117–118; King Dep.Ex. 20.) King suspended Mora for two days for insubordination. (King Dep .Ex. 20.) Paula Milroe, a Tribune employee, later told King that she overheard Mora telling other drivers in the driver room that he had called Berger a "m_____r f____ing liar." (King Dep. 131–132; Def.'s Docs. Tab D Ex. 8.) Mora claims that Milroe is lying. (Pl.'s Dep. 292.)

**E. Mora's Final Termination**

On March 5, 1996, King terminated Mora for poor job performance, poor customer service, mishandling company property, insubordination, and assaulting a co-worker. (Pl.'s Dep.Ex. 31.) On June 24, 1996, Mora was acquitted of the criminal charges filed by Carter. (Pl.'s Resp. to Def.'s 12(M) Statement 41.) Shortly thereafter, the IDHR dismissed Mora's 1993 discrimination charge for lack of substantial evidence. (Def.'s Pl.Dep.Ex. 17.) Undeterred, Mora filed a second charge of discrimination with the IDHR and the EEOC on August 28, 1996. This charge alleged that King terminated Mora on March 5, 1996 because of his national origin, and in retaliation for filing his 1993 discrimination charge against the Tribune.

Mora also filed a grievance with the Union regarding his termination. Mora's grievance went to arbitration before Arbitrator Lamont Stallworth ("Stallworth") on January 15, 1997. (Pl.'s Dep.Ex. 32.) On April 11, 1997, the IDHR dismissed Mora's second charge of discrimination for lack of substantial evidence. (Def.'s Docs. Tab D Ex. 19.) Finally, in a decision dated April 22, 1997, Stallworth upheld Mora's termination. (Pl.'s Dep.Ex. 32.) Mora subsequently filed this suit.

**ANALYSIS**

**A. Summary Judgment Standards**

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.1996). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, if the evidence is merely colorable, or is not sufficiently probative, the court may grant summary judgment. *Id.* at 249–50, 106 S.Ct. 2505. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of the judge deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. 2505.

These standards apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994).

## B. Plaintiff's Title VII Claim

Title VII of the Civil Rights Act of 1964 prohibits discrimination or retaliation against any employee because of the individual's race or national origin. 42 U.S.C.A. §§ 2000e(2)(a)(1), 2000e(3)(a). There are two ways for a plaintiff to establish a violation of Title VII:(1) by presenting direct evidence of an illegal motive, *see Essex v. United Parcel Service, Inc.*, 111 F.3d 1304, 1308 (7th Cir.1997); or (2) by utilizing the *McDonnell Douglas* burden-shifting analysis "to raise an inference of an illegal motive." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because Mora has not produced any direct evidence that the Tribune violated Title VII, his discrimination and retaliation claims must satisfy *McDonnell Douglas* in order to survive summary judgment. *See Essex*, 111 F.3d at 1309.

### 1. Discrimination

Under *McDonnell Douglas*, Mora must first establish a prima facie case of discriminatory discharge. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of racial discrimination, Mora must demonstrate: (1) that he is within a protected racial class; (2) that he met the Tribune's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that he has evidence from which the Court can infer that the adverse action sprang from a "legally forbidden ground," such as more favorable treatment of similarly-situated, non-minority employees. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996); *see also Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995).

█ If Mora succeeds in making his prima facie case, a rebuttable presumption of discrimination is created and the burden of production (though not proof) shifts to the Tribune to articulate a legitimate, non-discriminatory explanation for the adverse employment action. *See Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994). If the Tribune succeeds, the presumption dissolves and the burden of production shifts back to Mora to demonstrate that the proffered reason for the discharge is a pretext for racial discrimination. *Essex*, 111 F.3d at 1309. Pretext means a lie, specifically "a phony reason for some action." *Cecilio v. Allstate Ins. Co.*, 908 F.Supp. 519, 529 (N.D.Ill.1995), *citing Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). Mora can establish pretext by showing either: (1) that discriminatory intent more likely than not motivated the Tribune; or (2) that the Tribune's proffered explanation is "unworthy of credence" because the explanation has no basis in fact, is not the real reason for the adverse action, or is insufficient to justify any adverse action. *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995).

The Seventh Circuit has held that it is unnecessary to decide whether the employee has met his burden of establishing a prima facie case if he cannot show pretext. *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990). Thus, if Mora cannot demonstrate that the Tribune's articulated reasons for his discharge were pretextual, the Court need not consider Mora's prima facie showing. *See Sample v. Aldi, Inc.*, 61 F.3d 544, 548 (7th Cir.1995), *quoting United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").

█ In examining pretext, the question is whether the employer honestly believes its proffered reasons for discharge. *Sample*, 61 F.3d at 549. Title VII does

not vest federal courts with the authority to act as "super personnel departments," or to second-guess employers' good faith business judgments. *See Mills v.. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir.1999). Instead, it is the "perception of the decision-maker" that controls the pretext analysis. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337–38 (7th Cir.1991), *quoting Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir.1989). Thus, to prevent summary judgment, Mora must present evidence that the Tribune is insincere when it claims to have discharged him for poor job performance, poor customer service, mishandling company property, assaulting a co-worker, and insubordination. *See Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.1994).

■■ Mora is unable to establish that discriminatory intent more likely than not motivated the Tribune. *See Collier*, 66 F.3d at 892. Although Mora argues that the Tribune's proffered reasons for firing him are unreasonable and therefore a mere pretext for racially discriminatory intent, an employer need only supply "an honest reason, not necessarily a reasonable one." *Flores v. Preferred Tech. Group*, 182 F.3d 512, —— (7th Cir.1999). Arguing about the accuracy of the Tribune's assessment is a distraction, since the question is not whether the Tribune's reasons for its decision are correct, but whether the Tribune's description of its reasons is honest. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997), *quoting Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992). In any event, the Court does not find the Tribune's decision to discharge Mora—an employee with a long history of performance deficiencies and property damage, and accused of instigating a fight while servicing the Tribune's largest customer—to be unreasonable.

■ Mora is also unable to prove that the Tribune's proffered explanation is "unworthy of credence." *See Collier*, 66 F.3d at 892. In an attempt to establish pretext, Mora claims that the Tribune treated similarly situated, nonminority employees more favorably. In a Title VII case, evidence that an employer treated the plaintiff less favorably than a similarly situated employee outside the plaintiff's protected class may suggest that the proffered reason for discharge is a pretext. *Golden v. Services Exch., Inc.*, No. 97 C 7517, 1999 WL 350665, at *2 (N.D.Ill. May 19, 1999), *citing Essex*, 111 F.3d at 1311. However, in this case, Mora is unable to demonstrate that the thirteen employees whom he identifies as "comparables" are either similarly situated to him or experienced more favorable treatment by the Tribune.

■ To be "similarly situated," Mora must show that these employees: (1) held the same or similar employment positions; (2) had similar employment histories; and (3) engaged in similar misconduct giving rise to the employment action. *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 338 (7th Cir.1993). In addition, Mora must establish that these employees are outside of his protected class, and that each one experienced more favorable treatment by the Tribune. *See Essex*, 111 F.3d at 1311.

■ Mora's "comparables" fall into two categories: (1) employees who committed non-violent offenses against the Tribune; and (2) employees who engaged in physical altercations on company time. Despite Mora's well-documented history of performance deficiencies, King admits that the alleged assault on Carter on February 26, 1996 triggered Mora's termination. (King Dep. 128–29.) The Seventh Circuit recognizes that a physical attack upon a co-worker is an extremely serious offense that justifies a higher degree of accountability than non-physical transgressions. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 394–95 (7th Cir.1999); *see also Staples v. City of Milwaukee*, 142 F.3d 383, 384 (7th Cir.1998). Therefore, we do not consider those comparables who fall into the "non-violent offenses" catego-

ry to be similarly situated. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir.1994) (under *McDonnell Douglas*, in order to demonstrate pretext through disparate treatment, employees must engage in acts of "comparable seriousness" to be similarly situated to plaintiff); *see also Weiss*, 990 F.2d at 338 (to be similarly situated to plaintiff, the comparable employee must engage in misconduct similar to that which gave rise to the adverse employment action). The Court therefore limits its analysis to those employees who committed physical offenses.

■ Mora alleges that Kevin Killis, Anthony DeLaurentis, and James Hicks were all involved in physical altercations with co-workers or other individuals while they worked at the Tribune.[6] Nevertheless, the Tribune did not terminate these non-minority employees. Although Mora admits that his familiarity with the facts surrounding these incidents was based solely on "general knowledge" or "the grapevine" prior to discovery, (Pl.'s Dep. 79–80, 82, 84, 89, 91, 93, 97, 98), he argues that the Tribune did not discharge Killis, DeLaurentis, and Hicks because they were not Mexican–American, and because none of the three men had filed a discrimination charge against the Tribune. (Pl.'s Resp. to Def.'s 12(M) Statement 48, 50.)

Mora's argument fails to account for King's testimony that if an employee is involved in a physical fight, the Tribune will investigate the incident and terminate the instigator if there are other independent witnesses to the incident. (King Dep. 25.) King discharged Mora only after interviewing the two eyewitnesses to the alleged assault who identified Mora as the aggressor. Mora has not produced any evidence to show that King did not believe the witness accounts that he relied upon when making this decision. Mora does not dispute the lack of third-party witnesses to the physical altercations involving Killis, DeLaurentis, and Hicks. In addition, Mora's attack on Carter occurred on the premises of one of the Tribune's largest retail customers: none of Mora's comparables engaged in such a highly visible display of gross misconduct. *See Roberts v. Unidynamics Corp.*, 126 F.3d 1088, 1094 (8th Cir.1997) (employer may conclude

**6.** Mora claims that Killis struck him for the second time on or about August 20, 1992. (Pl.'s Dep.Ex. 29.) King was not aware of the alleged altercation between the two men (King Dep. 150–151, 155), Mora admits that the only witnesses to the alleged incident were Killis and himself. (Pl.'s Resp. to Def.'s 12(M) Statement 46); *see E.E.O.C. v. Mitsubishi Motor Mfg. of America, Inc.*, 102 F.3d 869, 870 (7th Cir.1996) (employer must know what is going on in the workplace in order to exercise discipline). Neither Mora nor Killis was disciplined for this behavior. (Pl.'s Dep. 86, 87.) On June 5, 1985, a route helper accused Killis of physically hitting and verbally abusing him. (King Dep.Ex. 31.) Killis denied hitting the helper. *Id.* There were no witnesses to the alleged incident other than Killis and the helper. (King Dep.Ex. 31; King Dep. 154.) The Tribune did not discipline Killis for this allegation, but King was not responsible for disciplining the drivers at this time. (King Dep. 154); *see Auston v. Schubnell*, 116 F.3d 251, 254 (7th Cir.1997) (to be deemed similarly situated, the individuals with whom plaintiff seeks to compare his/her treatment must report to the same supervisor).

On January 22, 1990, DeLaurentis was arrested for an alleged battery on an off-duty Chicago Police Officer. The off-duty officer supposedly yelled and screamed at DeLaurentis to move his truck, but did not identify himself. DeLaurentis and the officer "had a few words" and a "shoving match," and then the officer identified himself and had DeLaurentis arrested. (King Dep.Ex. 39.) DeLaurentis was suspended for two days for arguing with someone on the street, however the case against him never went to court. *Id.*

On December 5, 1996, Wilson, a route helper, accused Hicks of physically abusing him. (King Dep.Ex. 41.) According to Wilson, Hicks left the passenger-side door of the delivery truck open in sub-zero degree wind chills. *Id.* In addition, Wilson alleged that Hicks violently accelerated the truck causing the metal door to slide backwards and slam on Wilson's hand. *Id.* The Tribune subsequently suspended Hicks for two days for "unprofessional conduct." *Id.* King does not believe that there were any witnesses to these events, since the incident in question occurred on the delivery truck. (King Dep. 181.)

that plaintiff's misconduct was more serious than that of supposedly similarly situated employees based on fact that plaintiff's behavior is "highly visible"). Mora has therefore failed to present any evidence that attacks the Tribune's veracity or that similarly situated employees were treated more favorably. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir .1997).

In sum, Mora has not demonstrated that the Tribune's legitimate, non-discriminatory reasons for discharging him are a pretext for racial discrimination. *Essex*, 111 F.3d at 1309. He has no direct evidence to support his allegation that discriminatory intent more likely than not motivated the Tribune. *See Collier*, 66 F.3d at 892. In addition, Mora is unable to prove that the Tribune's proffered reasons for firing him are "unworthy of credence" because of more favorable treatment of similarly situated employees outside of Mora's protected class. *See Golden*, No. 97 C 7517, 1999 WL 350665, at *2, *citing Essex*, 111 F.3d at 1311. For these reasons, the Court finds that the Tribune's proffered explanations for discharging Mora are not a pretext for racial discrimination. The Tribune is therefore entitled to summary judgment with regard to this aspect of Mora's claim.

### 2. Retaliation

Because the same pretext analysis applies here as above, Mora's retaliation claim fails as well. Mora is no more able to prove that the Tribune's stated reason were a pretext for retaliation than for discrimination.

Furthermore, Mora is unable to make out a prima facie case of retaliation under Title VII, under which Mora must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse action; and (3) that there is a causal link between the protected activity and the adverse action. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998); *Essex*, 111 F.3d at 1304.

Generally, a plaintiff alleging retaliation under Title VII may establish a causal link at the prima facie case stage of her claim by introducing evidence that his discharge took place "on the heels of protected activity." *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). A close temporal connection between the two events "is generally enough to satisfy the third [prong] of the prima facie test." *Id.* at 797. However, as the temporal distance between the claimant's protected expression and the employer's adverse action increases, the likelihood that a causal link exists between the two events diminishes. *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 485 (7th Cir.1996); *accord Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 480 (7th Cir.1995) ("[T]he substantial time lapse between the two events is counter-evidence of any causal connection.").

Mora filed his first discrimination claim with the IDHR and the EEOC two and half years before the Tribune fired him. Seventh Circuit case law clearly holds that such a lengthy delay before the adverse action takes place cannot establish a causal link between the two events. *See Davidson*, 133 F.3d at 511 (five months is too long); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992) (four months); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (nearly six months).[7]

---

**7.** Although King claims that he knew of Mora's discrimination charges prior to 1995 (King Dep. 41), Mora alleges—without pointing to any evidence—that King did not learn of these charges until December 4, 1995, when the IDHR sent King notice of a fact-finding conference to be held on February 1, 1996. (Pl.'s Resp. to Def.'s 12(M) Statement 11.) This argument, even if true, does not help Mora to narrow the gap between the two events. The Seventh Circuit has already held that four months is too long to suggest a causal link between the protected expression and the adverse action. *See Juarez*, 957 F.2d

However, simply because the time between the employer's adverse action and the plaintiff's statutorily protected expression is too lengthy to suggest a causal link between them does not preclude the employee from making out a prima facie case of retaliation under Title VII. *Davidson,* 133 F.3d at 500. Rather, the employee must then introduce some additional proof that a causal nexus exists between the protected expression and the adverse employment action. *See Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 891 n. 6 (7th Cir.1996); *see also Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir. 1998).

Mora alleges that once King received notice of the IDHR's fact-finding hearing in December of 1995, he instructed his subordinates to start creating a paper trail in order to justify Mora's discharge. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J. 2.) Mora introduces no documents, witness statements (other than his own), affidavits, memoranda, or logical facts in support of this theory. *Wagner v. NutraSweet Co.,* 95 F.3d 527, 532 (7th Cir.1996) (to avoid summary judgment, plaintiff must rely on concrete evidence to demonstrate genuine issue of material fact). Against this, the Tribune produces evidence that Maher, Mora's Division Boss, was consistently critical of Mora's performance more than six months before King received the IDHR notice. *See infra* pp. 629–30. This is insufficient to establish the necessary causal link between his protected expression and the Tribune's adverse employment action. As the Seventh Circuit has recognized, every employee with performance problems "would file a [discrimination] charge just to get a little unemployment insurance" if such a charge could insulate them from the consequences of their deficient performance. *Bermudez v. TRC Holdings Inc.,* 138 F.3d 1176, 1179 (7th Cir.1998);

*Clay v. Interstate Nat. Corp.,* 900 F.Supp. 981, 993 (N.D.Ill.1995) (finding that probationary employee with notice of impending evaluation could not "straightjacket" employer by filing a discrimination charge.) Because Mora cannot establish a prima facie case or demonstrate pretext, the Tribune is entitled to summary judgment with regard to Mora's retaliation claim.

## CONCLUSION

After an altercation with a coworker, Riccardo Mora was terminated by the Tribune. Mora argues that the Tribune's heavy-handed response was motivated by his race and his protected activity. We disagree. The Tribune proffered legitimate, non-discriminatory reasons for discharging Mora, and Mora failed to introduce any evidence demonstrating that the Tribune's explanation was a pretext for racial discrimination or retaliation. In addition, Mora is unable to establish a prima facie case of retaliation by the Tribune. Perhaps if the Tribune valued Mora as an employee, it would have attempted to diffuse the volatile Carter situation when it first arose—but the law did not require the Tribune to do so. For these reasons, the Court grants the Tribune's motion for summary judgment (9–1) with respect to Mora's claims of racial discrimination and retaliation under Title VII. The Clerk of the Court is directed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of the Tribune and against Mora.

---

at 321. In addition, the Seventh Circuit considers the time of filing of a charge of discrimination to be the reference point for measuring the time interval between the protected expression and the adverse action in a Title VII retaliation claim. *See Davidson,* 133 F.3d at 511 (time between filing of charge of discrimination and adverse employment action governs); *Derwinski,* 967 F.2d at 1174–75 (same); *Juarez,* 957 F.2d at 321 (same).